IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 04–cv–01565–EWN–PAC

STEPHEN R. MERRITT,

      Plaintiff,

v.

TELLABS OPERATIONS, INC., a Delaware corporation,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

    This is an employment discrimination case.  Plaintiff Stephen R. Merritt alleges that Defendant Tellabs Operations, Inc. discriminated against him based on his age in violation of the Age Discrimination Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (2006), and breached the duty of good faith and fair dealing in discharging Plaintiff.  This matter is before the court on Defendant's "Motion For Summary Judgment," filed April 29, 2005.  Jurisdiction is based on 28 U.S.C. § 1331 (2006).

# FACTS

## 1.   *Factual Background*

On March 20, 2000, Defendant hired Plaintiff for the position of Vice President and
General Manager of the Qwest team in the North American Sales Organization.  (Mot. For
Summ. J., Br. in Supp. of Mot. For Summ. J., Statement of Undisputed Facts ¶ 1 [filed Apr. 29,
2005] [hereinafter "Def.'s Br."]; *admitted at* Pl.'s Resp. to Def.'s Mot. For Summ. J., Resp. to
Statement of Undisputed Facts ¶ 1 [filed June 3, 2005] [hereinafter "Pl.'s Resp."].)  Plaintiff was
forty-seven years old at the time Defendant hired him.  (*Id.*)  Plaintiff participated in Defendant's
independent local exchange carrier ("ILEC") group that sold products to customers like Qwest,
Verizon, Bell South, and SBC Corporation.  (*Id.*, Statement of Undisputed Facts ¶ 2; *admitted at*
Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 2.)  In August 2000, Michael Birck was
Defendant's Chief Executive Officer ("CEO").  (*Id.*, Statement of Undisputed Facts ¶ 3; *admitted
at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 3.)  Birck stepped down from this
position for two years and resumed in the same position in the Fall of 2002.  (*Id.*)

### a.   *Defendant's Alleged Pattern of Replacing Younger Employees With Older
Employees*

Plaintiff reported to Don Jones for approximately twelve months.  (Pl.'s Resp., Statement
of Additional Disputed Facts ¶ 20; *admitted in relevant part at* Def.'s Reply to Pl's Resp. to
Def.'s Mot. For Summ. J., Resp. Concerning Alleged Disputed Facts ¶ 20 [filed June 20, 2005]
[hereinafter "Def.'s Reply"].)  At this time, Jones was in his "mid-[fifties]."  (*Id.*, Statement of
Additional Disputed Facts ¶ 21; *admitted in relevant part at* Def.'s Reply, Resp. Concerning

Alleged Disputed Facts ¶ 21.)  Prior to October or November 2002, Rick LaDuca was Plaintiff's immediate supervisor.  (Def.'s Br., Statement of Undisputed Facts ¶ 5; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 5.)  LaDuca and Plaintiff are approximately the same age.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 26; *admitted in relevant part at* Def.'s Reply, Resp. Concerning Alleged Disputed Facts ¶ 26.)  Following October or November 2002, Charles Bernstein became Plaintiff's immediate supervisor.  (Def.'s Br., Statement of Undisputed Facts ¶ 5; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 5.)  In October 2002, Bernstein was approximately forty-two or forty-three years old.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 30; *admitted in relevant part at* Def.'s Reply, Resp. Concerning Alleged Disputed Facts ¶ 30.)  Robert Pullen ran Defendant's sales group and supervised Plaintiff's immediate supervisors.  (Def.'s Br., Statement of Undisputed Facts ¶ 4; *admitted in relevant part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 4.)

Plaintiff alleges that there were numerous occasions during his employment when a younger person "replaced" an older person in the workplace.  Specifically, Plaintiff alleges that the following "replacements" occurred: (1) Jones replaced Anders Gustafson, (2) Bernstein replaced LaDuca; (3) Pullen replaced Gustafson, (4) Drew McLean replaced Jim Jolling, (5) Jeff Rainey replaced Craig Speak, (6) Ben Shat replaced Bernstein, (7) Edward Kennedy replaced Birck, (8) Shat replaced McLean, and (9) Pat Gault replaced Plaintiff.  (*Id.*, Statement of Undisputed Facts ¶ 50; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 50.)  Plaintiff bases his knowledge of Jones' departure on "secondhand information, scuttlebutt," and "water-cooler type conversation."  (*Id.*, Statement of Undisputed Facts ¶ 51; *admitted at* Pl.'s

Resp., Resp. to Statement of Undisputed Facts ¶ 51.)  Plaintiff could only speculate as to whether

someone other than Gustafson should have gotten Jones' job.  (*Id.*, Statement of Undisputed

Facts ¶ 52; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 52.)  Plaintiff does

not think anyone else was vying for LaDuca's position when Bernstein took over.  (*Id.*, Statement

of Undisputed Facts ¶ 53; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 53.)

Plaintiff testified that Bernstein was less experienced than LaDuca because Bernstein was

"younger, had less tenure," and was "less seasoned and mature."  (*Id.*, Statement of Undisputed

Facts ¶ 54; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 54.)

> Q.   Is it possible that a younger person can have more experience than an older
>      person?
> A.   Sure.
>
> Q.   Is it possible that a younger person could have more seasoned maturity
>      than an older person?
> A.   Sure.

(*Id.*, Ex. A–1 at 125 [Dep. of Pl.].)  Plaintiff testified that he did not have much knowledge about

the situation involving McLean and Jolling because "it was outside of [his] sphere of control and

influence."  (*Id.*, Statement of Undisputed Facts ¶ 55, Ex. A–1 at 126 [Dep. of Pl.]; *admitted at*

Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 55.)  Plaintiff based his opinion regarding

the situation involving Rainery and Speak on his personal opinion.  (*Id.*, Statement of Undisputed

Facts ¶ 56; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 56.)  Plaintiff based

his opinion regarding Shat's age on conversations he had with Shat and Shat's youthful

appearance.  (*Id.*, Statement of Undisputed Facts ¶ 57; *admitted at* Pl.'s Resp., Resp. to

Statement of Undisputed Facts ¶ 57.)  Finally, with respect to Kennedy replacing Birck, Plaintiff

testified as follows:

> Q.    Okay.  What was [] Kennedy's position?
> A.    He was a senior vice president promoted to president, and I'm not sure I
>       have this completely right, but I believe he was replacing [] Birck at the
>       time.  Birck was the CEO, then he left when an interim CEO was put in
>       place for a couple of years, then he came back as CEO, and Kennedy was
>       elevated to president.  And I think he was — replaced Birck.
>
> Q.    And then Birck came back and replaced him, replaced [] Kennedy?
> A.    I believe so, but that was after my departure, so I'm not sure if that's
>       exactly what happened.

(*Id.*, Ex. A–1 at 134 [Dep. of Pl.].)

### b.    *Plaintiff's Performance at Defendant's Company*

From the time Defendant hired Plaintiff to the time Defendant fired Plaintiff, Plaintiff's

revenues dropped sixty percent.  (*Id.*, Statement of Undisputed Facts ¶ 17; *admitted in relevant*

*part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 17.)  Plaintiff's performance reviews

were generally "average."  (*Id.*, Statement of Undisputed Facts ¶ 18; *admitted at* Pl.'s Resp.,

Resp. to Statement of Undisputed Facts ¶ 18.)  Based on Plaintiff's marginal performance,

Defendant selected Plaintiff for layoff in August 2002.  (*Id.*, Statement of Undisputed Facts ¶ 19;

*admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 19.)  Defendant later removed

Plaintiff from this list.  (*Id.*)

During November and December of 2002, Bernstein informed Plaintiff on three or four

occasions that his performance had to improve.  (*Id.*, Statement of Undisputed Facts ¶ 23;

*admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 23.)  On December 5, 2002,

Bernstein informed Plaintiff, in writing, that he was "very concerned that after a considerable amount of time, REAL PROGRESS has not and is not being made at QWEST to improve [Defendant's] strategic position." (*Id.*, Statement of Undisputed Facts ¶ 24; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 24.)  On December 6, 2002, Bernstein informed Plaintiff, in writing, of the importance of Plaintiff meeting his year-end quota.  (*Id.*, Statement of Undisputed Facts ¶ 25; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 25.)  In January 2002, Bernstein and Plaintiff met to discuss Plaintiff's performance.  (*Id.*, Statement of Undisputed Facts ¶ 26; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 26.)  Although Plaintiff's peers who managed the Verizon, SBC Corporation, and Bell South accounts did not meet their quotas in 2001 and 2002, each attained over fifty percent of his quota in one of the two years.  (*Id.*, Statement of Undisputed Facts ¶ 27; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 27.)  Plaintiff attained less than twenty-five percent of his Qwest quota in each of the two years.  (*Id.*)  In 2001, the highest quota attained by any of Plaintiff's peers was 55.72%.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 68; *admitted in relevant part at* Def.'s Reply, Resp. Concerning Alleged Disputed Facts ¶ 68.)  On February 5, 2003, Defendant terminated Plaintiff's employment.  (Def.'s Br., Statement of Undisputed Facts ¶ 6; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 6.)

Plaintiff was forty-nine years old at the time Defendant fired him.  (*Id.*, Statement of Undisputed Facts ¶ 6; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 6.)  Plaintiff testified that his sales performance at Defendant's company "could have been better." (*Id.*, Statement of Undisputed Facts ¶ 15; *admitted at* Pl.'s Resp., Resp. to Statement of

Undisputed Facts ¶ 15.)  Defendant contends that Pullen decided to terminate Plaintiff because of poor performance, including Plaintiff's failure to: (1) meet his quota; (2) sell new products; (3) be in touch with his account as he continually said he was going to sell new products; (4) let his account managers call on Qwest executives and other morale issues; and (5) participate in strategic planning sessions.  (*Id.*, Statement of Undisputed Facts ¶ 29.)  Pat Gault replaced Plaintiff.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 64; *admitted at* Def.'s Reply, Resp. Concerning Alleged Disputed Facts ¶ 64.)  Gault was in his early forties.  (*Id.*)

Plaintiff cannot specifically recall complaining to anyone about age discrimination during his employment with Defendant.  (*Id.*, Statement of Undisputed Facts ¶ 33, Ex. A–1 at 256–57 [Dep. of Plaintiff].)  Plaintiff alleges that Bernstein and Pullen discriminated against him based on his age, and that Birck was involved from a "strategic point of view" based on a Chicago Tribune article published some five weeks after Plaintiff's termination.  (*Id.*, Statement of Undisputed Facts ¶ 34; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 34.)  Plaintiff does not contend that any of his other supervisors, including Roger Shope, Jones, Gustaffson, or LaDuca discriminated against him.  (*Id.*, Statement of Undisputed Facts ¶ 35; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 35.)

**2.    *Procedural History***

On July 29, 2004, Plaintiff filed a complaint in this court.  (Compl. [filed July 29, 2004] [hereinafter "Compl."].)  Plaintiff asserted claims for: (1) age discrimination under the ADEA; (2) promissory estoppel; and (3) breach of the covenant of good faith and fair dealing.  (*Id.* ¶¶

31–50.)  On October 18, 2004, Defendant filed its answer to Plaintiff's complaint.  (Answer [filed Oct. 18, 2004].)

On May 17, 2005, Defendant filed its motion for summary judgment.  (Def.'s Br.) Defendant argues that it is entitled to summary judgment because: (1) Plaintiff cannot show direct evidence of discrimination; (2) Plaintiff cannot establish a prima facie case of indirect discrimination because Plaintiff cannot show he was satisfactorily performing his job; (3) Plaintiff cannot establish a promissory estoppel claim because Plaintiff's own testimony refutes his allegation of reliance; and (4) Plaintiff's final claim for breach of covenant of good faith and fair dealing must fail because Colorado law does not recognize an implied covenant of good faith and fair dealing in the employment context.  (*Id.*)  On June 3, 2005, Plaintiff filed his response in opposition to Defendant's motion for summary judgment.  (Pl.'s Resp.)  On June 20, 2005, Defendant filed its reply in support of its motion for summary judgment.  (Def.'s Reply.)  This matter is fully briefed.

## ANALYSIS

### 1. *Standard of Review*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2006); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the

initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Celotex Corp.*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e). "'Only disputes over facts that might affect the outcome of the suit under governing law will preclude the entry of summary judgment.'" *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531 (10th Cir. 1998) (quoting *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). The factual record must be viewed in the light most favorable to the nonmoving party. *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 [10th Cir. 1990].)

**2.     *Evaluation of Plaintiff's Claims***

      ***a.       Age Discrimination***

Plaintiff contends that Defendant terminated him in violation of the ADEA. (Compl. ¶¶ 31–38.) The ADEA states that it is unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff who seeks to prove age discrimination can use either direct or

indirect evidence.  *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000).  In the instant case, Plaintiff seeks to prove direct and indirect evidence of discrimination.  I address each in turn.

### (1)    Direct Evidence

"A plaintiff proves discrimination through direct evidence by establishing proof of 'an existing policy which itself constitutes discrimination.'"  *Id.* (quoting *Ramsey v. City & County of Denver*, 907 F.2d 1004, 1008 [10th Cir. 1990]).  Plaintiff argues that Birck's comment to a Chicago Tribune reporter five weeks after Plaintiff's termination is direct evidence of age discrimination.  (Pl.'s Resp. at 21–22.)  The Chicago Tribune quoted Birck saying: "[w]e're reducing the average age of senior management with this announcement.  That's a good thing as far as I'm concerned."  (Def.'s Br., Ex. A–8 [Chicago Tribune Article].)  "'Statements which on their face are expressions of personal opinion, however, can only support an inference of discrimination if the trier of fact finds the inference reasonable, and so constitute only circumstantial or indirect evidence of discrimination against the plaintiff.'"  *Stone*, 210 F.3d at 1135 (quoting *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1477 [10th Cir. 1996]).  Plaintiff asserts that Birck's remarks cannot be dismissed as "personal opinion" because "he speaks on behalf of Defendant and its policies."  (Pl.'s Resp. at 22.)

Despite Birck's role in Defendant's company, his statement is "'not direct evidence of causation on the employment decision.'"  *Stone*, 210 F.3d at 1137 (quoting *Ramsey*, 907 F.2d at 1008).  This case is analogous to *Ramsey*.  In *Ramsey*, the plaintiff argued that the Director of the Traffic Division, James Brown, was generally known to believe that certain jobs were more

suitable for women than others and direct evidence of discrimination existed.  *Ramsey*, 907 F.2d

at 1008.  Indeed, there was evidence that Brown had "ideas about women's place in the

workforce." *Id.*  Brown testified that he thought some women were better suited for certain jobs.

*Id.*  Despite this, Brown was in charge when the plaintiff began working for the city and did hire

her.  *Id.*  The Tenth Circuit determined that Brown's comments did not evince a policy of

discrimination.  *Id.*  The Court held that "[f]or [the plaintiff's] argument to be valid, the evidence

would need to show that Brown acted on his discriminatory beliefs. . . . Abhorrent as Brown's

private opinions might be, they do not constitute direct evidence of discriminatory conduct. " *Id.*

Here, Birck's comments reflect his personal opinion, not a company policy, and therefore

this statement does not constitute direct evidence of discrimination.  Plaintiff cannot show that

Birck's statements were connected to Defendant's decision to terminate Plaintiff.  *See Heim v.*

*Utah*, 8 F.3d 1541, 1546–47 (10th Cir. 1993) (holding that one supervisor's single statement that

he hated having women in the office, unconnected to the personnel action at issue, was not direct

evidence of a discriminatory policy).  Like the *Ramsey* plaintiff, Plaintiff cannot demonstrate that

Birck or any of Defendant's other employees acted on the alleged discriminatory comment.  In

fact, Birck did not make this comment until five weeks after Defendant terminated Plaintiff.  Thus,

Birck's comment does not reflect an existing company policy and therefore is not direct evidence

of discrimination.  I must turn to the indirect method of proof established by *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792 (1973).

### (2)   *Indirect Evidence*

If, as here, Plaintiff's claim is based upon a disparate treatment analysis in reliance upon indirect evidence, he must first meet his initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802.   Once Plaintiff establishes a prima facie case, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *Id.*   "At the summary judgment stage, it then becomes the plaintiff's burden to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual — i.e. unworthy of belief." *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995).   If Plaintiff succeeds both in making out a prima facie case of discrimination and in showing that Defendant's reasons are pretextual, Plaintiff's claims will withstand summary judgment. *Id.*

### (A)   *Prima Facie Case*

In order to prove a prima facie case of age discrimination under the ADEA, Plaintiff must show that: "'(1) he is within the protected age group; (2) he was doing satisfactory work; (3) he was discharged; and (4) his position was filled by a younger person.'" *Rivera v. City and County of Denver*, 365 F.3d 912, 920 (10th Cir. 2004) (quoting *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 [10th Cir. 1998]).   Defendant does not dispute prongs one, three, and four. (Def.'s Br. at 18.)   Defendant contends that "[t]he primary issue for purposes of this [m]otion, [is] whether Plaintiff was doing satisfactory work." (*Id.*)

Plaintiff's burden in establishing a prima facie case "is not onerous." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).   The district court must not consider Defendant's

legitimate non-discriminatory reason for firing Plaintiff when evaluating Plaintiff's prima facie case. *MacDonald v. E. Wy. Mental Health Center*, 941 F.2d 1115, 1121 (10th Cir. 1991). In *MacDonald*, the Tenth Circuit described the quantum of evidence Plaintiff must proffer to meet this prong of his ADEA prima facie case. *Id.* Specifically, Plaintiff may make out a prima facie case of discrimination in a discharge case by credible evidence that: (1) he continued to possess the objective qualifications he held when he was hired; (2) his own testimony that his work was satisfactory, even if Defendant disputes this testimony; or (3) he held his position for a significant period of time. *Id.* Here, Plaintiff continued to possess the objective qualifications he held when he was hired. Specifically, *MacDonald* adopted the standard set forth in *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503 (5th Cir. 1988), in evaluating this factor. In *Bienkowski*, the Fifth Circuit determined that a plaintiff continues to possess the necessary qualifications for his job if the "plaintiff had not suffered physical disability or loss of a necessary professional license or some other occurrence that rendered him unfit for the position for which he was hired." *Bienknowski*, 851 F.2d at 1506. Based on this generous standard, Plaintiff has demonstrated that he performed his position in a satisfactory manner. Thus, Plaintiff has demonstrated a prima facie case under the ADEA. Next, I discuss Defendant's legitimate discriminatory reason for terminating Plaintiff.

### *(B)    Legitimate Non-Discriminatory Reason For Termination*

If the plaintiff establishes a prima facie case, "the defendant must carry the burden to provide a legitimate nondiscriminatory reason for the plaintiff's termination." *McKnight*, 149 F.3d at 1128. Defendant's burden is:

-13-

merely to articulate through some proof a facially nondiscriminatory reason for the termination; the defendant does not at this stage of the proceedings need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion.  However, the proffered reason for the action taken against the minority employee must be reasonably specific and clear.

*E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir. 1992) (citations omitted) (footnote omitted).  Defendant asserts it fired Plaintiff because: (1) he was not performing his position in a manner satisfactory to Defendant; (2) he engaged in series of incidents involving questionable conduct; and (3) Defendant reduced its workforce by almost fifty percent during the time of Plaintiff's employment.  (Def.'s Br. at 21–30.)  Defendant's explanations as to why it terminated Plaintiff are more than sufficient to carry Defendant's burden at this stage.

### (C)     *Pretext*

If Defendant meets its burden at the second stage of showing a "legitimate nondiscriminatory reason for plaintiff's termination," Plaintiff can still prevail if he can show "pretext."  *McKnight*, 149 F.3d at 1128.  "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 [10th Cir.1997]).

Plaintiff alleges that Defendant's reasons for terminating his employment are pretextual because: (1) his performance was satisfactory; (2) his younger peers were not terminated despite

failing to meet their quotas; (3) Defendant had a policy of replacing younger employees with older employees as evidenced by the Chicago Tribune Article; and (4) Defendant departed from its standard operating procedures by way of "disturbing procedural irregularities." (Pl.'s Resp. at 27–44.) I address Plaintiff's arguments in turn.

### (i)    *Plaintiff's Performance Was Not Satisfactory*

Defendant contends that it fired Plaintiff, in part, because Plaintiff did not meet his quota. (Def.'s Br. at 18; Def.'s Reply at 28.)  Plaintiff asserts, on the other hand, that he "was not meeting his Qwest quota because Qwest was not in a financial position to be purchasing Defendant's products, not because [Plaintiff's] performance was in any way deficient." (Pl.'s Resp. at 31.)  Here, Plaintiff's own testimony is contradictory and refutes his contention as to this point.  Plaintiff testified that: (1) his sales performance at Defendant's company "could have been better;" (2) he was "not bringing the numbers in;" (3) LaDuca would have been "remiss" to give Plaintiff a higher than an average performance rating because Plaintiff was not bringing in the numbers; (4) his revenues dropped sixty percent from the time he was hired to the time he was fired; (5) each time he met with Bernstein, Bernstein told him that he must meet his sales quota numbers; and (6) based on his *marginal* performance, Defendant initially selected him for layoff in August 2002, less than a year after Defendant hired him.  (Def.'s Br., Statement of Undisputed Facts ¶¶ 14–19; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 14–19.) Thus, Plaintiff's own testimony establishes that his performance was unsatisfactory.

Plaintiff, relying on his version of Pullen's and Bernstein's testimony, contends that "all ILECS were suffering financially" and there was a "direct correlation between an ILEC's capital

expenditures and the percentage of sales quota achieved." (Pl.'s Resp. at 29–30.)  Plaintiff

contends that his "poor performance was not the result of any deficiency on his part, but that it

was directly attributable to market conditions and Qwest's financial difficulties." (*Id.* at 31.)

Plaintiff's argument is disingenuous.  First, as stated above, Plaintiff testified that his sales

performance "could have been better." (Def.'s Br., Statement of Undisputed Facts ¶ 15; *admitted*

*at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 15.)  Second, Defendant terminated

Plaintiff because he did not make his sales quota in addition to being poor in comparison to his

peers. (Def.'s Reply. at 30.)  Defendant agrees that all ILEC's were suffering financially, but

Plaintiff's peers selling to other ILEC's attained at least fifty percent of their quotas in 2001 or

2002. (*Id.* at 30–31.)  Indeed, Plaintiff admits that his peers who managed the Verizon, SBC

Corporation, and Bell South accounts did not meet their quotas in 2001 or 2002, yet, each

attained over fifty percent of his quota in one of the two years. (Def.'s Br., Statement of

Undisputed Facts ¶ 27; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 27.)

Plaintiff attained less than twenty-five percent of his Qwest quota in each of the two years. (*Id.*)

Accordingly, Plaintiff cannot demonstrate pretext as to this issue.

### *(ii)      Treatment of Younger Peers*

Plaintiff alleges that Defendant's reasons for terminating him were pretextual because

Defendant did not terminate his younger peers despite their inability to meet their quotas. (Pl.'s

Resp. at 35.)  Specifically, Plaintiff contends that he "was similarly situated to the managers of the

Verizon, SBC Corporation, and Bell South accounts." (Pl.'s Resp. at 36.)  Plaintiff's argument is

misplaced.  To be similarly situated, all the comparators must have "similar job performances

without differentiating or mitigating circumstances." *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 532 (10th Cir. 1994). As stated above, Plaintiff admits that he performed significantly worse in comparison to his peers. (Def.'s Br., Statement of Undisputed Facts ¶ 27; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 27.) Plaintiff's testimony demonstrates that he substantially underperformed in comparison to his peers and had the lowest quota attainment percentages for two straight years. (*Id.*) Accordingly, the managers of the Verizon, SBC Corporation, and Bell South accounts are not similarly situated to Plaintiff and Plaintiff cannot demonstrate pretext as to this point.

### (iii)   *Defendant's Age Related Comments and Practices*

Plaintiff contends that Defendant's proffered reasons for terminating him were a pretext for discrimination because Defendant had a "campaign of replacing older employees with younger replacements" and Defendant's most senior executives encouraged this practice. (Pl.'s Resp. at 36.) Specifically, Plaintiff contends the following evidence demonstrates this policy: (1) Defendant replaced older, more experienced employees with younger employees; (2) Birck's comments in the Chicago Tribune article; and (3) Kennedy's comments that Plaintiff was part of the "old guard." I address each argument in turn.

First, Plaintiff contends that Defendant had a policy of replacing older, more experienced employees with younger employees. (Pl.'s Resp. at 36–38.) Specifically, Plaintiff alleges that:

> Jones was in his mid-50's, and he was replaced by Gustaffson, who was approximately [forty-one] years old at the time. [] Gustaffson supervised [Plaintiff] from November of 2001 until November of 2002, and [] LaDuca was inserted as an intermediary manager between [Plaintiff] and [] Gustaffson during that time. [] LaDuca is approximately the same age as [Plaintiff]. [] Pullen, then approximately

> [thirty-nine] years old, then replaced [] Gustaffson. [] Bernstein, who was
> approximately [forty-two] or [forty-three] years old at the time, then replaced []
> LaDuca in October of 2002. In addition to being younger, [] Bernstein had less
> tenure and was less experienced than [] La Duca.

(*Id.* at 37.)  Plaintiff's only support for this proposition is his own deposition testimony.  As set forth more fully in the factual background section, *Facts* § 1a, *supra*, Plaintiff admits that he bases all this information on "secondhand information" "scuttlebutt" and his own perception of people's ages, duties, abilities, and experience.  (Def.'s Br., Statement of Undisputed Facts ¶¶ 51–58; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 51–58.)  Plaintiff's mere opinions regarding Defendant's hiring and firing practices cannot create a genuine issue of fact for summary judgment purposes.  Thus, Plaintiff cannot prove pretext as to this point.

Second, Plaintiff contends that Birck's comments to the Chicago Tribune on March 12, 2003, are evidence of Defendant's discriminatory policy and demonstrate that Defendant's reasons for terminating him are pretextual.  In a Chicago Tribune article dated March 12, 2003, Birck acknowledged that personnel restructuring had the effect of elevating several younger executives.  (*Id.*, Ex. A–8 [Chicago Tribune Article].)  As discussed above, the Chicago Tribune quoted Birck as saying, "[w]e're reducing the average number of senior management with this announcement.  That's a good thing as far as I'm concerned."  (*Id.*)  This statement is at best characterized as a "stray remark."  *See Stone*, 210 F.3d at 1140 (holding that high level executive's comments that "at [plaintiff's] age, it would be difficult to train for another position" or "difficult to find a new job," were stray remarks).

"Age-related comments referring directly to the plaintiff can support an inference of age discrimination, but 'isolated [or] ambiguous comments' may be, . . . too abstract to support such an inference." (*Id.* [quoting *Cone*, 14 F.3d at 531]).   The court in *Cone* further reasoned that "[i]solated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions." *Cone*, 14 F.3d at 531.   Here, in light of the fact that Plaintiff has not demonstrated any other evidence of pretext, Birck's comment standing alone is nothing more than a stray remark.   Further, Plaintiff has not demonstrated that Birck's comments were sufficiently related to Plaintiff's termination.   Notwithstanding the fact that Defendant terminated Plaintiff five weeks before Birck made the comment to the Chicago Tribune, Plaintiff admits that Birck did not have any involvement in Defendant's decision to terminate Plaintiff.   (Def.'s Br., Statement of Undisputed Facts ¶ 71; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 71.)   Accordingly, Plaintiff has not demonstrated the necessary nexus between the discriminatory statement and Defendant's termination decision.   As such, it is insufficient to create a genuine issue of fact as to pretext.

Finally, Plaintiff contends that Kennedy advised him that Pullen and Bernstein perceived Plaintiff as being "part of the old guard" and believed that Plaintiff "should possess more of the traits of this young Ben Shat."   (Pl.'s Resp. at 40.)   Plaintiff contends that theses statements are evidence of Defendant's "youth movement," and create a genuine issue of fact as to pretext.   (*Id.*)   In support, Plaintiff cites his own deposition testimony.   (*Id.*)   Plaintiff's recitation regarding a statement Pullen and Bernstein allegedly made to Kennedy is inadmissible hearsay.   "Hearsay is a statement, other than one made by the declarant . . . offered in evidence to prove the truth of the

matter asserted." Fed. R. Evid. 801(c) (2006).  Hearsay testimony that would be inadmissible at trial cannot be used to defeat summary judgment.  *Thomas v. Int'l Bus. Mach.*, 216 F.3d 478, 485 (10th Cir. 1995).  Accordingly, Plaintiff cannot demonstrate pretext as to this point.

> ### (iv)   Plaintiff Cannot Demonstrate "Disturbing Procedural Irregularities" In Defendant's Conduct

Finally, Plaintiff asserts that he "may also establish that the proffered reason for his termination was pretextual by demonstrating that Defendant departed from its standard operating procedures by way of disturbing procedural irregularities."  (Pl.'s Resp. at 41–44.)  Specifically, Plaintiff alleges that he "was fired without having been afforded the benefit of any progressive disciple whatsoever."  (*Id.* at 43.)  Irrespective of whether Defendant afforded Plaintiff the benefit of any progressive discipline procedures, Plaintiff cannot demonstrate pretext.

Plaintiff admits that Defendant's employee guidelines did not create a contract and that they could be changed — either enhanced or downgraded — at any time.  (Def.'s Br., Statement of Undisputed Facts ¶ 75; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 75.)  Further, Plaintiff acknowledges that Defendant did not need to follow the performance guidelines in all cases.  (*Id.*, Statement of Undisputed Facts ¶ 76; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 76.)  Indeed, Plaintiff only speculates that Defendant should have applied the guidelines to his case.  (*Id.*, Statement of Undisputed Facts ¶ 77; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 77.)

> Q.   Okay.  Is it your contention that this policy had to be applied to you?
> A.   It is my opinion that in most cases it would be, and I probably put myself under the [seventy], [eighty], [ninety] percent that it probably would be.

(*Id.*, Ex. A–1 at 169 [Dep. of Pl.].)  Thus, Plaintiff's own admission demonstrates that Defendant did not have an obligation to apply the disciplinary procedures to Plaintiff and Defendant's failure to do so cannot be considered a pretext for discrimination.  Accordingly, Plaintiff cannot demonstrate pretext as to this issue.

For the foregoing reasons, Plaintiff cannot demonstrate that Defendant's reasons for terminating Plaintiff were pretextual.  Accordingly, Defendant is entitled to summary judgment on Plaintiff's ADEA claim.

> **b.** ***Promissory Estoppel and Breach of the Covenant of Good Faith and Fair Dealing***

Plaintiff's second and third claims for relief are for promissory estoppel and breach of the covenant of good faith and fair dealing, premised upon state law.  (Compl. ¶¶ 39–50.)  This court has jurisdiction over the ADEA claim under 28 U.S.C. § 1331, federal question jurisdiction.  Plaintiff does not assert diversity jurisdiction as a basis for his second and third claims for relief.  (*Id.* ¶ 4.)  The record before this court reveals that the parties are not diverse.  (*Id.*)  My only jurisdiction over Plaintiff's state law claims, therefore, is supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) (2006).

Since the claim under federal law has been dismissed, and this claim provided the sole basis for this court's original jurisdiction, I decline to exercise supplemental jurisdiction over Plaintiff's second and third claims and dismiss them without prejudice to refiling in state court.  28 U.S.C. § 1367(c)(3) ("[t]he district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original

jurisdiction"); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("if the federal claims are dismissed before trial . . . the state claims should be dismissed as well").

**3.** **Conclusion**

Based on the foregoing it is therefore

ORDERED as follows:

1.  Defendant's Motion for Summary Judgment (# 23) is GRANTED.

2.  The clerk shall forthwith enter judgment in favor of Defendant and against Plaintiff, dismissing the federal claim with prejudice and the state claims without prejudice.  Defendant may have its costs by filing a bill of costs within eleven days of the date of this order.

Dated this 31st day of March, 2006.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge